CALVIN JOHNSON,

    Plaintiff,

     v.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

    Defendant.

No. 10 C 7848

Magistrate Judge Mary M. Rowland

## MEMORANDUM OPINION AND ORDER

Plaintiff Calvin Johnson filed this action seeking review of the final decision of the Commissioner of Social Security ("Commissioner") denying his applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act ("SSA"). 42 U.S.C. §§ 416, 423(d), 1381a. The parties have consented to the jurisdiction of the United States Magistrate Judge, pursuant to 28 U.S.C. § 636(c), and the parties have filed cross motions for summary judgment. For the reasons stated below, the case is remanded for further proceedings consistent with this opinion.

## I. THE SEQUENTIAL EVALUATION PROCESS

To recover Disability Insurance Benefits ("DIB") or Supplemental Security Income ("SSI") under Titles II and XVI of the SSA, a claimant must establish that he

or she is disabled within the meaning of the SSA.[1] *York v. Massanari*, 155 F. Supp.

2d 973, 977 (N.D. Ill. 2001); *Keener v. Astrue*, No. 06 C 0928, 2008 WL 687132, at *1

(S.D. Ill. 2008). A person is disabled if he or she is unable to perform "any substan-

tial gainful activity by reason of any medically determinable physical or mental im-

pairment which can be expected to result in death or which has lasted or can be ex-

pected to last for a continuous period of not less than 12 months." 20 C.F.R. §§

404.1505(a), 416.905(a). In determining whether a claimant suffers from a disabil-

ity, the Commissioner conducts a standard five-step inquiry:

1. Is the claimant presently unemployed?
2. Does the claimant have a severe medically determinable physical or mental impairment that interferes with basic work-related activities and is expected to last at least 12 months?
3. Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations?
4. Is the claimant unable to perform his or her former occupation?
5. Is the claimant unable to perform any other work?

20 C.F.R. §§ 404.1509, 404.1520, 416.909, 416.920; *see Clifford v. Apfel*, 227 F.3d

863, 868 (7th Cir. 2000). "An affirmative answer leads either to the next step, or, on

Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any

point, other than Step 3, ends the inquiry and leads to a determination that a

claimant is not disabled." *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985).

"The burden of proof is on the claimant through step four; only at step five does the

burden shift to the Commissioner." *Clifford*, 227 F.3d at 868.

---

[1] The regulations governing the determination of disability for DIB are found at 20 C.F.R. § 404.1501 *et seq*. The SSI regulations are virtually identical to the DIB regulations and are set forth at 20 C.F.R. § 416.901 *et seq*.

## II. PROCEDURAL HISTORY

Plaintiff applied for DIB and SSI on April 8, 2008, alleging that he became disabled on October 30, 2004, due to osteoarthritis of the right ankle.[2] (R. at 12, 60–61, 153–59). The application was denied initially and on reconsideration, after which Plaintiff filed a timely request for a hearing. (*Id.* at 12, 60–63, 104–08).

On October 29, 2009, Plaintiff, represented by counsel, testified at a hearing before an Administrative Law Judge ("ALJ"). (R. at 12, 28–59). The ALJ also heard testimony from Thomas Grzesik, a vocational expert ("VE"). (*Id.*).

The ALJ denied Plaintiff's request for benefits on January 13, 2010. (R. at 12–19). Applying the five-step sequential evaluation process, the ALJ found, at step one, that Plaintiff has not engaged in substantial gainful activity since October 30, 2004, the alleged onset date. (*Id.* at 14). At step two, the ALJ found that Plaintiff's status post gunshot wound to the right ankle with osteoarthritis is a severe impairment. (*Id.*). At step three, the ALJ determined that Plaintiff does not have an impairment or combination of impairments that meet or medically equal the severity of any of the listings enumerated in the regulations. (*Id.*).

---

[2] Plaintiff previously filed for DIB and SSI on February 13, 2006, which were denied on April 9, 2007. (R. at 12, 67–76). When the Appeals Council denied Plaintiff's request for review on May 18, 2007 (*id.* at 79–82), the ALJ's decision became final. Accordingly, the doctrine of *res judicata* precludes a finding of disability prior to April 9, 2007, the date of the last denial. *Phillips v. Astrue*, 422 F. App'x 528, 529 (7th Cir. 2011); 20 C.F.R. § 404.957(c)(1).

The ALJ then assessed Plaintiff's residual functional capacity ("RFC")[3] and determined that he has the RFC to perform light work except that Plaintiff cannot climb ladders, ropes, or scaffolds; he cannot have concentrated exposure to heights, hazards, or extreme cold; he cannot work on uneven surfaces; he can only occasionally climb stairs and ramps, kneel, crouch, and crawl; and he can only perform work that involves simple instructions and routine tasks. (R. at 15). Based on Plaintiff's RFC and the VE's testimony, the ALJ determined at step four that Plaintiff was capable of performing past relevant work as a machine packager and an inspector. (*Id.* at 18–19). Accordingly, the ALJ concluded that Plaintiff was not suffering from a disability as defined by the SSA. (*Id.* at 19).

The Appeals Council denied Plaintiff's request for review on November 10, 2010. (R. at 1–5.) Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner. *Villano v. Astrue*, 556 F.3d 558, 561–62 (7th Cir. 2009).

## III. STANDARD OF REVIEW

Judicial review of the Commissioner's final decision is authorized by § 405(g) of the SSA. In reviewing this decision, the Court may not engage in its own analysis of whether the plaintiff is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Nor may it "reweigh

---

[3] Before proceeding from step three to step four, the ALJ assesses a claimant's residual functional capacity. 20 C.F.R. § 404.1520(a)(4). "The RFC is the maximum that a claimant can still do despite his mental and physical limitations." *Craft v. Astrue*, 539 F.3d 668, 675–76 (7th Cir. 2008).

evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute [its] own judgment for that of the Commissioner." *Id.* The Court's task is "limited to determining whether the ALJ's factual findings are supported by substantial evidence." *Id.* (citing § 405(g)). Evidence is considered substantial "if a reasonable person would accept it as adequate to support a conclusion." *Indoranto v. Barnhart*, 374 F.3d 470, 473 (7th Cir. 2004). "Substantial evidence must be more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). "In addition to relying on substantial evidence, the ALJ must also explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005).

Although this Court accords great deference to the ALJ's determination, it "must do more than merely rubber stamp the ALJ's decision." *Scott v. Barnhart,* 297 F.3d 589, 593 (7th Cir. 2002) (citation omitted). The Court must critically review the ALJ's decision to ensure that the ALJ has built an "accurate and logical bridge from the evidence to his conclusion." *Young,* 362 F.3d at 1002. Where the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002).

# IV. DISCUSSION

## A. The Relevant Medical Evidence

Plaintiff suffered a gunshot wound to his right ankle in 1991. (R. at 184, 274, 336). To avoid amputation, the surgeons fused Plaintiff's right foot to his tibia and fibula and used abdominal muscle to fill his right foot. (*Id.* at 184, 248, 274, 336; *see id.* at 41). Plaintiff returned to work, but his condition steadily worsened causing him debilitating pain and imposing functional limitations. (*Id.* at 184, 336). By October 2004, Plaintiff was unable to continue working. (*Id.*).

Plaintiff began treating with U Jayakumar, M.D., and Svril Pairwar, M.D., at the Community Health clinic in October 2007. (R. at 187). He complained of constant, sharp right-foot pain, radiating to his knee and hip. (*Id.* at 274). On examination, Plaintiff had reduced range of motion in his right foot; he had no dorsiflexion, plantar flexion, or rotation; his toes were permanently curled and he was unable to move them; and he had hyperpigmentation and scarring over his foot and leg. (*Id.* at 275). His doctor prescribed ibuprofen 600mg,[4] referred him for x-rays of his foot, and referred him to an orthopedic specialist at Cook County Hospital. (*Id.*).

A November 2007 x-ray revealed that Plaintiff had multiple shotgun pellets in his right foot, which obscured the view and limited evaluation. (R. at 244). The x-ray further indicated probable secondary osteoarthritis of the ankle joint and foot. (*Id.*).

---

[4] Ibuprofen 600mg is a prescription strength medication used to treat moderate to strong pain associated with osteoarthritis. <www.drugs.com>

On February 12, 2008, Plaintiff reported that he stopped taking ibuprofen because it was not relieving his pain. (R. at 277). He stated that nothing alleviates the pain except cold and that any movement aggravates the pain. (*Id.*). Dr. Jayakumar diagnosed chronic right ankle pain and advised Plaintiff to try taking both ibuprofen and acetaminophen 500mg "round the clock" to alleviate the pain. (*Id.*).

On April 1, 2008, Plaintiff reported that the ibuprofen and acetaminophen helped his pain, but he was still unable to do everyday activities. (R. at 278). The pain shoots up Plaintiff's leg to his knee and hip joints, especially when he is carrying any weight. (*Id.*). On examination, Plaintiff was unable to move his ankle in any direction, and was unable to straighten his toes. (*Id.*). He was encouraged to continue the pain medication and to pursue physical therapy. (*Id.*).

Dr. Pairwar completed a medical report of incapacity in April 2008. (R. at 336–39). On examination, Dr. Pairwar found no mobility in Plaintiff's ankle and decreased sensation. (*Id.* at 336). Dr. Pairwar diagnosed buckshot wound to right ankle with developed osteoarthritis. (*Id.* at 337). Dr. Pairwar found that Plaintiff will likely not improve the function of his right ankle but could show some improvement with pain management. (*Id.*). Because of Plaintiff's inability to stand or walk and his moderate pain, Dr. Pairwar opined that Plaintiff was partially disabled and unable to work. (*Id.*). However, because Dr. Pairwar had not yet seen the November 2007 x-ray and Plaintiff was still waiting for the orthopedic referral to Cook County Hospital (*id.*), Dr. Pairwar found that a re-evaluation of Plaintiff's condition in 90 days was warranted (*id.* at 338).

On June 11, 2008, Virgilio Pilapil, M.D., a state agency physician, reviewed the medical records and made a physical RFC assessment. (R. at 266–73). While Dr. Pairwar had completed the medical report of incapacity in April 2008 (*id.* at 336–39), it appears that Dr. Pilapil did not review it (*id.* at 273) ("No [Medical Source Statement (MSS)] in file and no controlling weight given.").[5] Dr. Pilapil concluded that Plaintiff had exertional and postural limitations, but no manipulative, visual, communicative, or environmental limitations, except Plaintiff should avoid concentrated exposure to hazards. (*Id.* at 267–70). This statement was affirmed by state agency physician Bharati Jhaveri, M.D., on July 23, 2008. (*Id.* at 283–85).

On July 1, 2008, Plaintiff reported that his pain has not been alleviated by medication, orthotics or physical therapy. (R. at 281). He described the pain as a throbbing pain that comes and goes, but typically 8/10 and localized around the heel and lateral side of his right foot. (*Id.*). Plaintiff stated that he was still waiting for an orthopedic appointment at Cook County Hospital. (*Id.*). While Plaintiff's doctor was skeptical that his foot could be surgically repaired, he recommended that Plaintiff continue the current dosage of acetaminophen and ibuprofen until he has an opportunity to consult with the orthopedic specialist. (*Id.* at 281–82). Plaintiff stated that he wanted to avoid using narcotics to relieve his pain. (*Id.* at 282). Accordingly, his

---

[5] "An MSS explains what an individual can do despite severe impairments, in particular an individual's physical or mental abilities to perform work-related activities on a sustained basis." *Skinner*, 478 F.3d at 843 (citation omitted).

doctor recommended that Plaintiff try rolling his foot on a golf ball in the morning to loosen it and to try capsaicin cream to alleviate the pain.[6] (*Id.*).

An October 26, 2009 x-ray revealed innumerable round metallic densities about the right ankle obscuring fine bony detail. (R. at 415). The x-ray also revealed flexion of the third through fifth digits with decreasing sensitivity. (*Id.* at 416).

At the October 29, 2009 hearing, Plaintiff testified that because he has no bending motion in his right ankle, he has trouble walking, standing and balancing. (R. at 45). He has no movement in his right toes; they are curled over to where his toenails are almost touching the bottom of his shoe. (*Id.*). His right foot is very sensitive; it swells up when he does a lot of walking and in the cold. (*Id.* at 45–46). Sitting is also uncomfortable because he cannot bend his ankle and must keep his heel flat on the ground, which is painful. (*Id.* at 46–47). Plaintiff estimates that he can walk for 10 minutes, stand for 30–45 minutes, and sit for 1–2 hours before the pain becomes unbearable. (*Id.*). He has tried Tylenol, Motrin, ibuprofen and ice packs for the pain and nothing seems to help very much. (*Id.* at 47). The pain has gotten steadily worse over time and affects his ability to concentrate. (*Id.* at 51–52).

At home, Plaintiff is able to babysit his children and his girlfriend's children. (R. at 48–49). He is able to drive for 15–20 minutes at a time, carry light grocery bags— 10 to 15 pounds—and do a little "cooking and stuff." (*Id.* at 38, 47, 50). But his girl-

---

[6] Capsaicin cream is a topical analgesic, which is used to provide temporary relief of muscle and joint pain associated with arthritis. <www.drugs.com>

friend frequently has to carry the laundry downstairs and carry his two-year-old baby around. (*Id.* at 47).

## B. Analysis

Plaintiff raises four arguments in support of his request for a reversal and remand: (1) the ALJ's credibility determination is contrary to agency policy and case law; (2) the ALJ failed to properly weigh the treating physician's opinion; (3) the ALJ erred in according significant weight to the state agency reviewing physicians' opinions; and (4) the ALJ's RFC assessment contravenes agency policy. (Mot. 1, 4–15). The Court addresses each argument in turn.

### 1. *Plaintiff's Credibility*

Plaintiff contends that the ALJ erred in discounting his testimony about the nature and extent of his ailments. (Mot. 4–9.) He asserts that the ALJ's credibility determination was conclusory boilerplate, failed to analyze the requisite factors, failed to consider Plaintiff's reasons for not pursuing further treatment, and failed to explain how Plaintiff's daily activities undermined his assertion that he could not perform full-time employment. (*Id.*).

In determining credibility, "an ALJ must consider several factors, including the claimant's daily activities, [his] level of pain or symptoms, aggravating factors, medication, treatment, and limitations, and justify the finding with specific reasons." *Villano*, 556 F.3d at 562 (citations omitted); *see* 20 C.F.R. § 404.1529(c); Social Secu-

rity Ruling ("SSR")[7] 96-7p. An ALJ may not discredit a claimant's testimony about his symptoms "solely because there is no objective medical evidence supporting it." *Villano*, 556 F.3d at 562 (citing SSR 96-7p; 20 C.F.R. § 404.1529(c)(2)); *see Johnson v. Barnhart*, 449 F.3d 804, 806 (7th Cir. 2006) ("The administrative law judge cannot disbelieve [the claimant's] testimony solely because it seems in excess of the 'objective' medical testimony."). Even if a claimant's symptoms are not supported *directly* by the medical evidence, the ALJ may not ignore *circumstantial* evidence, medical or lay, which does support claimant's credibility. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539–40 (7th Cir. 2003). Indeed, SSR 96-7p requires the ALJ to consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and other relevant evidence in the case record." *Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007) (citation omitted); *see* 20 C.F.R. § 404.1529(c); SSR 96-7p.

The Court will uphold an ALJ's credibility finding if the ALJ gives specific reasons for that finding, supported by substantial evidence. *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009). The ALJ's decision "must contain specific reasons for a

---

[7] SSRs "are interpretive rules intended to offer guidance to agency adjudicators. While they do not have the force of law or properly promulgated notice and comment regulations, the agency makes SSRs binding on all components of the Social Security Administration." *Nelson v. Apfel*, 210 F.3d 799, 803 (7th Cir. 2000); *see* 20 C.F.R. § 402.35(b)(1). While the Court is "not invariably *bound* by an agency's policy statements," the Court "generally defer[s] to an agency's interpretations of the legal regime it is charged with administrating." *Liskowitz v. Astrue*, 559 F.3d 736, 744 (7th Cir. 2009).

credibility finding; the ALJ may not simply recite the factors that are described in the regulations." *Steele*, 290 F.3d at 942 (citation omitted); *see* SSR 96-7p. "Without an adequate explanation, neither the applicant nor subsequent reviewers will have a fair sense of how the applicant's testimony is weighed." *Steele*, 290 F.3d at 942.

In her decision, the ALJ made the following credibility determination:

> After careful consideration of the record, I find that [Plaintiff's] medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent that they are inconsistent with the above residual functional capacity assessment.
>
> *   *   *
>
> I further find that [Plaintiff's] allegations are not entirely credible. In reaching this finding, I have considered a variety of factors, including the objective medical evidence, the medical opinions of record, [Plaintiff's] treatment history, treatment modalities, and activities of daily living. As previously explained, [Plaintiff's] treatment has not been extensive. He was able to work full-time after his injury. He is not using any medications. While he said that medications never helped him in the past, he has not inquired with his doctor about the availability of other options. He also engages in activities of daily living that suggest he is not as limited as alleged. For example, he drove for periods of 15–20 minutes, until his license was suspended recently. He does the laundry, which requires him to go up and down stairs. He estimated that he could sit 1–2 hours, lift 10–15 pounds, stand 30–45 minutes, and walk 10–15 minutes. He spends his day watching television and watching his children. [Plaintiff] lives with his two-year-old and cares for the child. While his girlfriend also lives with them, she works full-time at night (10:30 pm to 6:30 am) and therefor sleeps when the child is awake, and accordingly, [Plaintiff] is caring for the child himself when his girlfriend [is] asleep during the daytime.

(R. at 16, 18).

Much of the ALJ's analysis is mere boilerplate that "yields no clue to what weight the trier of fact gave [Plaintiff's] testimony." *Parker v. Astrue*, 597 F.3d 920,

922 (7th Cir. 2010) (reviewing similar language and finding that "[i]t is not only boilerplate; it is meaningless boilerplate[; t]he statement by a trier of fact that a witness's testimony is 'not *entirely* credible' yields no clue to what weight the trier of fact gave the testimony"); *see Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 787 (7th Cir. 2003) ("This is precisely the kind of conclusory determination SSR 96-7p prohibits."). The ALJ does not explain which of Plaintiff's allegations were credible, which were incredible, or provide reasoning in support of his findings. *See Groneman v. Barnhart*, No. 06 C 0523, 2007 WL 781750, at *11 (N.D. Ill. March 9, 2007) ("The ALJ may have provided a *reason* for rejecting [claimant's] allegations—because he did not seek treatment and follow through with medication—but he did not provide *reasoning*.") (emphasis in original). The ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96–7p, at *2.

Under the circumstances, none of the reasons provided by the ALJ for rejecting Plaintiff's credibility are legally sufficient or supported by substantial evidence. First, as a preliminary matter, the ALJ failed to assess Plaintiff's credibility *before* determining his RFC. That Plaintiff's statements were "not credible to the extent that they are inconsistent with the above residual functional capacity assessment" (R. at 16), is "backward reasoning," *Dogan v. Astrue*, 751 F. Supp. 2d 1029, 1042 (N.D. Ind. 2010). The ALJ's "post-hoc statement turns the credibility determination

process on its head by finding statements that support the ruling credible and rejecting those statements that do not, rather than evaluating the [claimant's] credibility as an initial matter in order to come to a decision on the merits." *Brindisi*, 315 F.3d at 788.

Second, the ALJ expressed doubt about Plaintiff's credibility because his "treatment records are not very extensive and contain large gaps in treatment." (R. at 16; *see id.* at 18). But from October 2007 through the date of the hearing, Plaintiff was treated on over 20 separate occasions, at least 7 of which were directly related to his ankle injury. (*See generally*, *id.* at 242–416). The ALJ does not explain what "large gaps" she was concerned with and fails to acknowledge that for much of this period, Plaintiff was waiting for the orthopedic referral at Cook County Hospital. (*See id.* at 249, 254, 281–82, 337). In any event, the ALJ "must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment." SSR 96-7p, at *7; *accord Roddy v. Astrue*, — F.3d — , No. 12-1682, 2013 WL 197924, at *7 (7th Cir. Jan. 18, 2013). The record contains numerous references to Plaintiff's financial hardships, including notice of eviction, repossession of car, inability to contribute to his children's housing needs, and filing of bankruptcy. (*See*, *e.g.*, R. at 118–19, 121–27). The SSA "has expressly endorsed the inability to pay as an explanation excusing a claimant's failure to seek treatment." *Roddy*, 2013 WL 197924, at

*7; *see* SSR 96-7p, at *8 ("The individual may be unable to afford treatment and may not have access to free or low-cost medical services."). Before discounting Plaintiff's credibility, the ALJ should have questioned Plaintiff at the administrative hearing as to why he did not seek more treatment. *Roddy*, 2013 WL 197924, at *7 ("The agency requires ALJs to inquire about a claimant's reasons for not seeking treatment."); SSR 96-7p, at *7 (The ALJ "may need to . . . question the individual at the administrative proceeding in order to determine whether there are good reasons the individual does not seek medical treatment or does not pursue treatment in a consistent manner. The explanations provided by the individual may provide insight into the individual's credibility.").

Third, the ALJ erred in concluding that Plaintiff's employment after the 1991 gunshot wound casts doubt on his testimony that his fused right foot causes him great pain. (R. at 18.) On the contrary, a claimant's "unsuccessful attempts to pursue various vocations might just as easily provide corroboration that [his] impairments significantly limited [his] ability to work, as opposed to evidence that [his] ability was greater than [he] alleged." *McKinzey v. Astrue*, 641 F.3d 884, 891 (7th Cir. 2011). The ALJ did not consider the possibility that Plaintiff's employment attempts after his injury supports rather than undermines his testimony about the limitations wrought by his foot injury. In fact, there is no evidence in the record to contradict Plaintiff's statement that his condition steadily worsened, causing him debilitating pain and imposing functional limitations, until by October 2004, he was unable to continue working. (R. at 184, 336.)

Fourth, discounting Plaintiff's credibility merely because he is currently not using any medication is contrary to law. The ALJ found that Plaintiff's "treatment modalities" undermined his contentions of pain: "He is not using any medications. While he said that medications never helped him in the past, he has not inquired with his doctor about the availability of other options." (R. at 18). This statement is not entirely accurate. Instead, the record indicates that Plaintiff tried a number of treatment modalities at the encouragement of his doctors, including prescription strength pain medications, physical therapy, home exercises and orthotics, but that none was very effective. (*Id.* at 46, 252, 275, 277, 278, 281–82, 337–38). While his physicians may have been willing to prescribe stronger medications, Plaintiffs stated that he wanted to avoid using any narcotics to relieve his pain. (*Id.* at 282). The treating physicians were also waiting for Plaintiff to see an orthopedic specialist to determine if surgery was a viable option. (*Id.* at 281–82). The ALJ cannot discuss only those portions of the record that support his opinion. *See Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009) ("An ALJ may not selectively consider medical reports, especially those of treating physicians, but must consider all relevant evidence. It is not enough for the ALJ to address mere portions of a doctor's report.") (citations omitted); *Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007) ("An ALJ cannot disregard medical evidence simply because it is at odds with the ALJ's own unqualified opinion."). Under the circumstances, the ALJ should have questioned Plaintiff at his hearing about why he was not pursuing alternative pain relief regimens. SSR 96-7p, at *7–8.

Fifth, the ALJ challenged Plaintiff's credibility because of his activities of daily living. (R. at 18). Specifically, the ALJ identified three activities that were inconsistent with Plaintiff's allegations of pain: (1) driving a car for 15–20 minutes; (2) doing laundry; and (3) caring for his two-year-old child. (*Id.*). "[A]lthough it is appropriate for an ALJ to consider a claimant's daily activities when evaluating [his] credibility, SSR 96-7p, at *3, this must be done with care." *Roddy*, 2013 WL 197924, at *7. Indeed, the Seventh Circuit has "repeatedly cautioned that a person's ability to perform daily activities, especially if that can be done only with significant limitations, does not necessarily translate into an ability to work full-time." *Id*. "The critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons . . . , and is not held to a minimum standard of performance, as she would be by an employer." *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012) ("The failure to recognize these differences is a recurrent, and deplorable, feature of opinions by administrative law judges in social security disability cases."). And here, the ALJ does not explain how any of Plaintiff's daily activities equates to the ability to work full-time outside the home. On the contrary, the Seventh Circuit has found that doing laundry, helping children prepare for school, preparing dinner and washing dishes are "fairly restricted" activities "and not of a sort that necessarily undermines or contradicts a claim of disabling pain." *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001).

Finally, the ALJ has distorted the record. For example, the ALJ stated that Plaintiff's treatment was "conservative and routine" because his doctors recommended "rolling his foot on a golf ball to loosen it in the morning, applying capcasia crème to alleviate pain, using over-the-counter medications, and practicing strength and stretching exercises from physical therapy." (R. at 16–17) (citations omitted). But the ALJ failed to acknowledge that Plaintiff was prescribed ibuprofen 600mg, which is a prescription strength pain medication, and Plaintiff's doctors recommended these alternate therapies only because Plaintiff was reluctant to try stronger narcotics to relieve the pain. (*Id.* 275, 281–82). The ALJ also opined that Plaintiff stopped using his medications because he did not need them. (*Id.* at 17). On the contrary, Plaintiff stated that he stopped using his medications because they were not effective. (*Id.* at 47, 277, 281). The ALJ further concluded that Plaintiff's physician determined "no further surgery was warranted." (*Id.* at 17). However, while Plaintiff's treating physician was skeptical that Plaintiff's foot could be surgically repaired, he recommended that Plaintiff consult with an orthopedic specialist to determine if any surgery could alleviate his pain. (*Id.* at 281–82). And it's certainly not Plaintiff's fault that the county hospital had a lengthy waiting list for indigent care. (*See id.* at 249, 254, 281–82, 337).

On remand, the ALJ shall reevaluate Plaintiff's complaints with due regard for the full range of medical evidence. *See Zurawski*, 245 F.3d at 888.

## 2. Treating Physician's Opinion

Plaintiff contends that the ALJ failed to give controlling weight to the opinion of Dr. Pairwar, his treating physician. (Mot. 9–12). Plaintiff argues that the ALJ did not proffer a supportable rationale for determining not to afford Dr. Pairwar's opinion controlling weight. (*Id.* 11.)

By rule, "in determining whether a claimant is entitled to Social Security disability benefits, special weight is accorded opinions of the claimant's treating physician." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003). The opinion of a treating source is entitled to controlling weight if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." 20 C.F.R. § 404.1527(d)(2); *accord Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008). A treating physician typically has a better opportunity to judge a claimant's limitations than a nontreating physician. *Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996); *Grindle v. Sullivan*, 774 F. Supp. 1501, 1507–08 (N.D. Ill. 1991). "More weight is given to the opinion of treating physicians because of their greater familiarity with the claimant's conditions and circumstances." *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003). Therefore, an ALJ "must offer 'good reasons' for discounting a treating physician's opinion," *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010); 20 C.F.R. § 404.1527(d)(2), and "can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a nonexamining physician does not, by itself, suffice," *Gudgel*, 345 F.3d at 470.

If a nontreating physician contradicts the treating physician's opinion, it is the ALJ's responsibility to resolve the conflict. *Books*, 91 F.3d at 979 (ALJ must decide which doctor to believe). An ALJ may reject the opinion of a treating physician in favor of the opinion of a nontreating physician where the nontreating physician has special, pertinent expertise and where the issue is one of interpretation of records or results rather than one of judgment based on observations over a period of time. *Micus v. Bowen*, 979 F.2d 602, 608 (7th Cir. 1992) ("[I]t is up to the ALJ to decide which doctor to believe—the treating physician who has experience and knowledge of the case, but may be biased, or . . . the consulting physician, who may bring expertise and knowledge of similar cases—subject only to the requirement that the ALJ's decision be supported by substantial evidence."); *Hofslien v. Astrue*, 439 F.3d 375, 377 (7th Cir. 2006) ("So the weight properly to be given to testimony or other evidence of a treating physician depends on circumstances.").

If the ALJ determines that a treating physician's opinion should not be afforded controlling weight, "the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion." *Moss*, 555 F.3d at 561; *see* 20 C.F.R. § 404.1527. In sum, "whenever an ALJ does reject a treating source's opinion, a sound explanation must be given for that decision." *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011) (citing 20 C.F.R. § 404.1527(d)(2)).

In April 2008, Dr. Pairwar completed a medical report of incapacity. (R. at 336–39). On examination, Dr. Pairwar found no mobility in Plaintiff's ankle and decreased sensation and diagnosed buckshot wound to right ankle with developed osteoarthritis. (*Id.* at 336–37). Dr. Pairwar opined that Plaintiff will likely not improve the function of his right ankle but could show some improvement with pain management. (*Id.*). Dr. Pairwar concluded that Plaintiff was partially disabled and unable to work. (*Id.* at 337). However, because Plaintiff was still waiting for the orthopedic referral to Cook County Hospital (*id.*), Dr. Pairwar found that a reevaluation of Plaintiff's condition in 90 days was warranted (*id.* at 338).

In her decision, the ALJ's analysis of Dr. Pairwar's opinion is limited to a single paragraph:

> In April 2008, [Plaintiff's] physician completed a medical report regarding [Plaintiff's] ability to work. Dr. [Pairwar[8]] found [Plaintiff] partially disabled and stated that his condition was moderate. [Plaintiff] needed to be evaluated by an orthopaedic department. This decision was based on [Plaintiff's] inability to stand or walk (markedly decreased mobility) due to limited ankle mobility and moderate pain. However, Dr. [Pairwar] stated that this incapacity should be reevaluated within 90 days. Thus, this was clearly a short-term restriction and did not reflect ongoing limitations.

(R. at 17.) The ALJ then went on to give significant weight to the DDS physicians who found that Plaintiff could perform light work with some restrictions. (*Id.*).

Under the circumstances, the ALJ's conclusory remark that Dr. Pairwar's opinion was "clearly a short-term restriction" is legally insufficient and not supported by

---

[8] The ALJ inadvertently referred to Dr. Pairwar as Dr. Zuccarelli. (*Compare* R. at 17 *with id.* at 187, 338). Frank Zuccarelli was the Thornton Township Supervisor to whom Dr. Pairwar's report was directed. (*Id.* at 336).

substantial evidence. The ALJ did not provide the specific weight she was affording Dr. Pairwar's opinion. *See Campbell*, 627 F.3d at 308 ("Even if an ALJ gives good reasons for not giving controlling weight to a treating physician's opinion, she has to decide what weight to give that opinion."); *Punzio*, 630 F.3d at 710 ("And whenever an ALJ does reject a treating source's opinion, a sound explanation must be given for that decision."). And she failed to explicitly address the checklist of factors as applied to the medical opinion evidence. *See Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010) (criticizing the ALJ's decision which "said nothing regarding this required checklist of factors"); *Bauer*, 532 F.3d at 608 (stating that when the treating physician's opinion is not given controlling weight "the checklist comes into play"). Many of the factors support the conclusion that Dr. Pairwar's opinion should be given great weight: he treated Plaintiff on a regular basis for many months; his findings were supported by diagnostic and clinical tests; and his findings were consistent with the medical evidence. *See Campbell*, 627 F.3d at 308 ("Proper consideration of these factors may have caused the ALJ to accord greater weight to [the treating physician's] opinion.").

The medical evidence supports Dr. Pairwar's opinion. For example, the medical records establish that Plaintiff's condition had steadily deteriorated, with developing osteoarthritis in the right ankle, causing debilitating pain and imposing functional limitations. (R. at 184, 244, 274–75, 277, 278, 281–82). In her decision, the ALJ does not dispute the legitimacy of these findings or cite to any medical evidence to support her conclusion that Plaintiff's limitations are temporary. *See Moss*, 555

F.3d at 560 ("An ALJ's conjecture is never a permitted basis for ignoring a treating physician's views."); 20 C.F.R. § 404.1527(d)(2) (The opinion of a treating source is entitled to controlling weight if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence."); *accord Bauer*, 532 F.3d at 608. Moreover, Dr. Pairwar's notes reflect that the 90-day re-evaluation period was to account for Dr. Pairwar not having yet received the November 2007 x-ray and Plaintiff's approaching referral to an orthopedic specialist. (R. at 336–38). Thus, the 90-day period allowed for this new information to be included in a subsequent report.

Finally, the opinions of the nonexamining DDS physicians are not sufficient to reject Dr. Pairwar's opinion. "A contradictory opinion of a non-examining physician is not sufficient by itself to provide the evidence necessary to reject a treating physician's opinion." *Holmes v. Astrue*, No. 08 C 338, 2008 WL 5111064, at *7 (W.D. Wis. 2008)); *see Gudgel*, 345 F.3d at 470. Instead, "the opinions of State agency medical and psychological consultants . . . can be given weight only insofar as they are supported by evidence in the case record, considering such factors as the supportability of the opinion in the evidence including any evidence received at the administrative law judge and Appeals Council levels that was not before the State agency, the consistency of the opinion with the record as a whole, including other medical opinions, and any explanation for the opinion provided by the State agency medical or psychological consultant . . . . The adjudicator must also consider all other factors that could have a bearing on the weight to which an opinion is entitled, including any

specialization of the State agency medical or psychological consultant." SSR 96-6p, at *2.

Here, because the state agency consultant's opinion is not supported by the evidence in the case record, it is entitled to little weight. The only medical records to which the consultant refers are Plaintiff's November 2007 x-ray and his April 1, 2008 examination. (R. at 266–73; *see id.* at 244, 278). The consultant ignored—or did not review—the October 2007 examination, finding Plaintiff's toes permanently curled and referring him to an orthopedic specialist; the February 2008 treatment note, reporting constant pain; and the April 2008 medical report of incapacity, opining that Plaintiff was partially disabled and unable to work. (*Id.* at 274–75, 277, 336–39). Moreover, the state agency consultant did not elaborate on his opinion finding Plaintiff partially credible. (*Id.* at 273) ("Based on the evidence of record, [Plaintiff's] statements are found to be partially credible."). He did not explain which of Plaintiff's statements were credible, which were incredible, or provide reasoning in support of his findings. *See Groneman*, 2007 WL 781750, at *11.

On remand, the ALJ shall reevaluate the weight to be afforded Dr. Pairwar's opinion. If the ALJ has any questions about whether Plaintiff's impairments are short-term, she is encouraged to recontact Dr. Pairwar or order a consultative examination. *See* SSR 96-5p, at *2; *Barnett v. Barnhart*, 381 F.3d 664, 669 (7th Cir. 2004); 20 C.F.R. §§ 404.1517, 416.917. If the ALJ finds "good reasons" for not giving Dr. Pairwar's opinion controlling weight, *see Campbell*, 627 F.3d at 306, the ALJ shall explicitly "consider the length, nature, and extent of the treatment relation-

ship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion," *Moss*, 555 F.3d at 561, in determining what weight to give Dr. Pairwar's opinion.[9]

## C. Summary

In sum, the ALJ has failed to "build an accurate and logical bridge from the evidence to her conclusion." *Steele*, 290 F.3d at 941 (internal quotation omitted). This prevents the court from assessing the validity of the ALJ's findings and providing meaningful judicial review. *See Scott*, 297 F.3d at 595. On remand, the ALJ shall reevaluate the weight to be afforded Dr. Pairwar's opinion, explicitly addressing the required checklist of factors. The ALJ shall reassess Plaintiff's credibility with due regard for the full range of medical evidence. The ALJ shall then reevaluate Plaintiff's physical impairments and RFC, considering all of the evidence of record, including Plaintiff's testimony, and shall explain the basis of her findings in accordance with applicable regulations and rulings.

## V. CONCLUSION

For the reasons stated above, Plaintiff's Motion for Summary Judgment [17] is **GRANTED**, and Defendant's Motion for Summary Judgment [24] is **DENIED**. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed, and

---

[9] Plaintiff also contends that the ALJ's RFC assessment contravenes agency policy. (Mot. 14–15). In light of the Court's decision to remand for proper consideration of Plaintiff's credibility and the treating physician's opinion, the Court elects not to address this issue. Nevertheless, on remand, the ALJ is reminded that she should assess Plaintiff's RFC by "evaluating all limitations that arise from medically determinable impairments, even those that are not severe." *Villano*, 556 F.3d at 563.

the case is remanded to the Commissioner for further proceedings consistent with this opinion.

ENTER:

Dated: February 6, 2013

_Mary M Rowland_

MARY M. ROWLAND
United States Magistrate Judge